# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **DONNA CAMPBELL,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 1:17-cv-00744-ACA** |
| | ] | |
| **KBRWYLE TECHNOLOGY** | ] | |
| **SOLUTIONS, LLC, et al.,** | ] | |
| | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

Donna Campbell alleges that her former employer, KBRwyle Technology Solutions, LLC ("KBR"), discriminated against her because she was disabled, interfered with her ability to take leave under the Family Medical Leave Act ("FMLA"), and then fired her in retaliation for taking leave and/or filing an EEOC claim. KBR denies that it discriminated against Ms. Campbell or that it interfered with her FMLA rights, and maintains that it had a legitimate, non-discriminatory reason for terminating her.

Ms. Campbell asserts claims against KBR and her former supervisor, Defendant Fredran Patton, for interference and retaliation under the FMLA, discrimination and retaliation under the Age Discrimination in Employment Act

("ADEA"), and discrimination and retaliation under the Americans with Disabilities Act ("ADA").

Before the court is Defendants' motion for summary judgment. (Doc. 18). As explained below, Ms. Campbell concedes that Defendants are entitled to summary judgment on her ADEA claims against both Defendants and her ADA claims against Mr. Patton. Ms. Campbell's FMLA interference claim fails because she has not established that she was prejudiced by any interference with her FMLA rights. Ms. Campbell's FMLA and ADA retaliation claims fail because she has not established a *prima facie* case of retaliation. And, Ms. Campbell's ADA discrimination claim fails because she has not established that she is a qualified individual with a disability. Accordingly, the court **WILL GRANT** Defendants' motion for summary judgment.

## I.     BACKGROUND

In deciding a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012).

KBR[1] provides support at the U.S. Army Depot in Anniston, Alabama (the

---

[1] On September 19, 2016, KBR, Inc. purchased Honeywell Technical Solutions, Inc. ("HTSI") from Honeywell International, Inc. and converted HTSI into KBRwyle Technology Solutions, LLC. (Doc. 7 at 1 n.1). For ease of

"Depot") for the Total Integrated Engine Revitalization ("TIGER") Program. (*See* Doc. 20-1 at 17). Under its contract, KBR supplies parts and engineering services for AGT1500 engines used in M1 Abrams tanks. (Doc. 20-2 at 13, 17–18; Doc. 1 at 4). Once the military places an order and a production schedule is issued, KBR warehouse supervisors delegate tasks to KBR employees and prioritize orders based on the team's weekly production forecast. (Doc. 20-2 at 17; Doc. 20-4 at 34–35). Approximately sixteen full-time employees staff the warehouse including engineers, quality controller managers, and order fillers. (Doc. 20-2 at 10, 12).

The KBR warehouse at the Depot contains over 16,000 components that make up the AGT1500 turbine engine. (*Id.* at 17–18, 20). Order fillers retrieve parts from storage shelves and assemble orders on the warehouse production line. (*Id.* at 18–19). This process requires order fillers to transport large components through the facility using golf carts, forklifts, and wave machines. (*Id.* at 16–17; Doc. 20-1 at 26). Order fillers are also tasked with auditing orders, maintaining inventory, conducting cycle counts, and dispatching shipments for on time delivery. (Doc. 20-4 at 36; Doc. 20-1 at 61, 64). Due to the government's continuous production demands, overtime is "part of the job" (doc. 20-2 at 24), and

reference, the court will collectively refer to the companies both before and after the acquisition as "KBR."

order fillers often have to work at least four hours of overtime every other week. (Doc. 20-2 at 15, 23–24; Doc. 19 at 4 ¶ 17).

From 2008–2017, Ms. Campbell was employed by KBR as an order filler. (Doc. 20-1 at 15–16).  During the course of her employment, Ms. Campbell suffered from a number of psychiatric conditions including bipolar disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), and post-traumatic stress disorder ("PTSD").  (*Id.* at 11).  Ms. Campbell was prescribed medications to treat her conditions and attended regular therapy sessions.  (*Id.* at 18, 22).

In February 2016, KBR hired Fredran Patton as the logistics supervisor for the warehouse. (Doc. 20-4 at 4–5).  Mr. Patton was responsible for the day-to-day operations of warehouse employees and worked to ensure the team met its monthly production schedules. (*Id.* at 28; Doc. 20-3 at 19; Doc. 20-2 at 17, 19).  Mr. Patton was Ms. Campbell's direct supervisor. (Doc. 20-4 at 10).

In April 2016, KBR approved Ms. Campbell's request for intermittent FMLA leave to attend doctor's appointments and treat unexpected panic attacks. (Doc. 20-1 at 31–32, 156–61; Doc. 1 at 16, ¶ 86).  The leave ran through October 24, 2016. (Doc. 20-1 at 156). In accordance with KBR's FMLA policy, Ms. Campbell was required to "follow normal callout procedures" while on intermittent leave. (*Id.* at 159, Doc. 20-4 at 68).  Although the letter granting her intermittent

leave gave Ms. Campbell explicit instructions for handling unforeseeable leave (doc. 20-1 at 135, 160), Ms. Campbell believed that even unforeseeable leave required that an employee give 24 hours' notice before taking leave.  (*Id.* at 33).

During the intermittent leave period, Ms. Campbell suffered a panic attack which resulted in a severe migraine. (Doc. 20-4 at 64–65).  Although Ms. Campbell had been granted intermittent leave, she did not take it on this occasion. According to Ms. Campbell, she was "scared to take [FMLA]" due to her inability to satisfy KBR's twenty four hour notice requirement. (*Id.* at 64–65; Doc. 20-1 at 34).  Instead, Ms. Campbell attended her regularly scheduled shift and submitted a request to take vacation leave for the following day, which KBR approved.  (Doc. 20-4 at 65).

A week later, Ms. Campbell requested full-time FMLA leave. (Doc. 20-1 at 35; Doc 20-2 at 53).  KBR granted the request.  (Doc. 20-1 at 35).  While on full-time leave, Ms. Campbell filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging age and disability discrimination. (Doc. 20-12 at 2).  In her complaint, Ms. Campbell alleged that Mr. Patton refused to provide her the necessary training to receive a promotion and that management harassed her by requiring 24 hours' notice before she could use her "reasonable accommodation (FMLA) for [her] disability."  (*Id.*).

When Ms. Campbell exhausted her leave in early September, KBR granted her requests to extend leave through January 2017. (Doc 20-1 at 35–36). During this period, Ms. Campbell worked with the human resource department to develop reasonable accommodations that would allow her to return to work. (*Id.* at 192–94). On November 30, 2016, Ms. Campbell submitted a "reasonable accommodation request form" that included restrictions on her ability to work overtime and operate motorized vehicles due to her prescribed medications. (*Id.* at 198). KBR approved the request and temporarily assigned Ms. Campbell to complete only the auditing functions of the order filler position as a means to satisfy her reasonable accommodation request. (*Id.* at 64).

From January 2017 through February 2017, Ms. Campbell's auditing duties were limited to conducting quality control checks and ensuring orders were dispatched from the KBR warehouse on time. (Doc. 20-1 at 64). Because auditing was not considered a full-time position and was neither a contract deliverable nor funded position on the contract (doc. 19 at 14, ¶ 73), KBR and Ms. Campbell met weekly to discuss how to increase her assigned duties. (Doc. 20-5 at 10). Ultimately, these meetings revealed that the breadth of duties Ms. Campbell was able to perform in light of her restrictions was "very limited." (*Id.* at 11).

As the Army's production demands began to steadily increase, KBR found that the reallocation of Ms. Campbell's overtime hours was "putting other

employees at risk." (Doc. 20-2 at 23). KBR management determined that the "business could no longer support [Ms. Campbell's] restrictions" and decided to terminate her employment. (*Id.* at 20–21). Ms. Campbell separated from employment on February 8, 2017. (Doc. 20-1 at 70).

Two months after her termination, Ms. Campbell filed a second EEOC complaint. (Doc. 20-14 at 2). This complaint alleged that she was subjected to discrimination and retaliation because of her disability. (*Id.*). Specifically, she alleged that she was "not allowed to seek medical attention for [her] disability" and was terminated after she complained that KBR accommodated younger employees with medical needs. (*Id.*).

One month later, Ms. Campbell commenced this action, naming both KBR and Fredran Patton as defendants. (Doc. 1 at 3–5, ¶¶ 1–11). Ms. Campbell's complaint includes six counts. In Count One, Ms. Campbell alleges that KBR interfered with her FMLA rights by requiring that she provide twenty four hours' notice before taking intermittent leave. (*Id.* at 16–17, ¶¶ 84–88). In Count Two, Ms. Campbell claims that KBR and Mr. Patton retaliated against her for taking FMLA leave by terminating her employment. (*Id.* at 17–19, ¶¶ 89–94). In Count Three, Ms. Campbell contends that KBR and Mr. Patton discriminated against her on the basis of age by failing to provide voluntary training sessions. (*Id.* at 19–21, ¶¶ 95–105). In Count Four, Ms. Campbell alleges that KBR retaliated against her

for filing an age based discrimination charge with the EEOC. (Doc. 1 at 21–22, ¶¶ 106–08). In Count Five, Ms. Campbell claims that KBR discriminated against her on the basis of disability and failed to accommodate her disability in violation of the ADA. (*Id.* at 22–25, ¶¶ 109–20). In Count Six, Ms. Campbell claims that KBR retaliated against her for complaining to supervisors about her accommodations and for filing a disability discrimination charge with the EEOC. (*Id.* at 25–26, ¶¶ 122–28).

## II.    ANALYSIS

The Defendants move for summary judgment on all counts of the complaint. In deciding a motion for summary judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A disputed fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In response to Defendants' motion, Ms. Campbell concedes that summary judgment should be entered in favor of both Defendants on Counts Three and Four, which allege violations of the ADEA. (Doc. 42 at 24). Ms. Campbell also concedes that Mr. Patton is entitled to summary judgment on Counts Five and Six

for alleged violations of the ADA. (*Id.* at 26). Because Ms. Campbell concedes her ADEA claims and her ADA claims against Mr. Patton, the court does not evaluate the parties' substantive arguments with respect to the merits of those claims.

In support of their motion on Ms. Campbell's remaining claims, Defendants argue that Ms. Campbell is unable to establish a *prima facie* case or demonstrate that KBR's articulated reasons for its employment decisions are pretext for unlawful discrimination or retaliation.[2]

### A. *FMLA Interference (Count One)*

Ms. Campbell contends the Defendants interfered with her FMLA rights by requiring that she provide twenty four hours' notice when submitting intermittent leave requests. (Doc. 1 at 17 ¶ 88). Defendants argue they are entitled to summary judgment because Ms. Campbell cannot prove that she was denied an entitled benefit under the FMLA or prejudiced as a result of KBR's standard callout procedures.

The Eleventh Circuit has recognized a private right of action for an employer's interference with its employees' exercise of FMLA rights. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1247 (11th Cir. 2015). FMLA

---

[2] The Defendants also argue that Ms. Campbell failed to exhaust her administrative remedies with respect to her ADA claims. (Doc. 19 at 24–25). As explained below, Ms. Campbell's ADA claims fail on the merits. Therefore, the court does not consider the substance of the Defendants' exhaustion argument.

interference includes not only an employer's refusal to authorize FMLA leave, but also conduct that discourages an employee from using such leave. 29 C.F.R. § 825.220. To establish a *prima facie* case of FMLA interference, Ms. Campbell must show by a preponderance of the evidence "that [she] was denied a benefit to which [she] was entitled under the FMLA and has been prejudiced by the violation in some way." *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014) (internal quotation marks and citations omitted). Ms. Campbell is not required to prove intent; "employer's motives are irrelevant in the context of an interference claim." *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006)

In this case, Ms. Campbell received all of the benefits to which she was entitled under the FMLA and has failed to demonstrate any prejudice as a result of the Defendants' conduct. It is undisputed that all of Ms. Campbell's leave requests were granted by KBR. (Doc. 20-1 at 31–32, 156–61). Ms. Campbell bases her entire claim on the argument that she was told that FMLA leave—like vacation days—required 24 hours' notice. (*Id.* at 129, 291; Doc. 42 at 20). According to Ms. Campbell, this notice requirement interfered with her FMLA rights because she was "scared to take" leave less than 24 hours after she requested it. (Doc. 20-1 at 34). Her argument fails for several reasons.

First, the FMLA authorizes an employer to impose "usual and customary notice and procedural requirements for requesting leave" so long as employer does not disallow or delay leave if the employee does not comply with the employer's procedures. *See* 29 C.F.R. § 825.302(d). Therefore, the mere existence of a procedure requiring advance notice for FMLA leave is insufficient to prove an employer discourages an employee from using leave. Because Ms. Campbell has offered no other evidence to show interference in advance of the day she was allegedly "scared" to take the leave, her claim fails. *Cf. Diamond v. Hospice of Florida Keys, Inc.,* 677 Fed. Appx. 586, 593–94 (11th Cir. 2017) (interference found where, throughout intermittent leave period, employer demanded additional documentation such as gas and travel receipts having no necessary relation to the need for leave, additional "proof of need" for leave, and emails stating "Your continued unpaid time away from the workplace compromises the quality of care we are able to provide as an organization.").

Second, Ms. Campbell cannot establish that the 24 hour notice requirement actually discouraged her from taking leave. According to Ms. Campbell, KBR required 24 hours' notice before an employee could take FMLA leave *or vacation leave*. (Doc. 20-1 at 33–34). The only time Ms. Campbell alleges that this policy interfered with her taking leave was on June 6, 2016. (*Id.* at 34; Doc. 20-4 at 64–65). According to her testimony, she was afraid to ask for leave because she was

within the 24 hour period. (Doc. 20-1 at 34). Rather, Ms. Campbell instead requested—and received—the time off by using a vacation day. (*Id.* at 33–35). Given that the vacation and FMLA leave notice requirements are the same, it is illogical that Ms. Campbell would be afraid to use leave for a documented illness for which she was already granted intermittent leave but feel free to simply ask for the day off. If the notice requirement actually discouraged Ms. Campbell from taking leave, she would not have asked for vacation time in lieu of FMLA leave.

Finally, Ms. Campbell cannot prove prejudice. Ms. Campbell's sole argument regarding prejudice is her testimony that she wanted to use her FMLA leave on two other days. (Doc. 42 at 23) (citing *Diamond*, 677 Fed. Appx. at 594). However, unlike the plaintiff in *Diamond*, during the course of the year, Ms. Campbell used all of her available FMLA leave. *See Diamond,* 677 Fed. Appx. at 594. And, Ms. Campbell received all of the FMLA leave that she requested and to which she was entitled.

Based on these circumstances, and viewing the facts in a light most favorable to Ms. Campbell, a reasonable jury could not conclude that KBR either prevented or discouraged Ms. Campbell from asserting her FMLA rights and that she was prejudiced as a result. Accordingly, the court **WILL ENTER** summary judgment in favor of Defendants on Ms. Campbell's FMLA interference claim.

## B.     Retaliation Claims Under the FMLA and ADA (Counts Two and Six)

To establish a claim for retaliation under the FMLA or ADA, a plaintiff must demonstrate that: "(1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two. *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018). "The failure to satisfy any of these elements is fatal to a complaint of retaliation." *Higdon v. Jackson*, 393 F.2d 1211, 1219 (11th Cir. 2004). But, if a plaintiff establishes a *prima facie* case, then a defendant must provide a legitimate, non-retaliatory reason for its actions which a plaintiff then must rebut as pretext for retaliation. *Batson*, 897 F.3d at 1329. The court addresses Ms. Campbell's FMLA and ADA retaliation claims in turn.

### 1.     FMLA Retaliation

Ms. Campbell contends that Defendants retaliated against her under the FMLA by requiring 24 hours' notice before taking FMLA leave. (Doc. 20-1 at 74–75). Defendants argue that Ms. Campbell's FMLA retaliation claim fails because she has not demonstrated that KBR subjected her to an adverse action. The court agrees.

The 24 hour notice requirement is an employment policy. It is not itself an adverse action. In response to Defendants' motion for summary judgment, Ms. Campbell acknowledges that an adverse action is a required element of her *prima*

*facie* case for FMLA retaliation, but Ms. Campbell does not explain how the existence of the 24 hour notice requirement constitutes an adverse employment action. (*See* Doc. 42 at 24). Moreover, Ms. Campbell has not alleged or shown that KBR subjected her to the 24 hour notice requirement for exercising some other right under the FMLA. And, as explained above, KBR did not deny Ms. Campbell FMLA leave to which she was entitled. *See supra* pp. 10-12. Therefore, Ms. Campbell has not established a *prima facie* case of retaliation because she has not shown that KBR took an adverse action against her for engaging in protected conduct under the FMLA. Accordingly, the court **WILL ENTER** summary judgment in favor of Defendants' on Ms. Campbell's FLMA retaliation claim.

2.      *ADA Retaliation*

Ms. Campbell contends that KBR retaliated against her in violation of the ADA by terminating her employment for filing an EEOC complaint in September 2016 and complaining to her supervisors in January 2017 about her proposed accommodations. (Doc. 1 at 25–26, ¶¶ 122–28). KBR argues that Ms. Campbell cannot establish a *prima facie* case because there is no causal connection between her September 2016 EEOC charge and her February 2017 termination and because she did not actually complain in January 2017 about her accommodations. (Doc. 19 at 32–33).

Defendants do not dispute that Ms. Campbell engaged in protected activity when filed an EEOC charge. (*See* Doc. 19 at 32–33). But, Ms. Campbell's ADA retaliation claim based on her September 2016 EEOC charge fails as a matter of law because there is no causal connection between her filing the charge and her termination. To establish a causal connection, a plaintiff must demonstrate "that the decision-makers were aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (internal quotation marks and alterations omitted). A plaintiff can show a causal connection "by showing close temporal proximity between the statutorily protected activity and the adverse employment action[, . . . b]ut mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal citation omitted)).

Ms. Campbell's February 2017 termination lacks a temporal relationship to her filing the September 2016 EEOC charge because her termination took place five months after she filed her EEOC claim. *See e.g., Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence tending to show causation, a three-and-one-half month proximity between a protected activity

and an adverse employment action is insufficient to create a jury issue on causation.").  Ms. Campbell submits that she "is not relying on 'mere' temporal proximity alone, but on the abundance of separate evidence of causation."  (Doc. 42 at 33).  However, Ms. Campbell's brief does not identify the separate evidence of causation that she claims exists nor does it "cite [] particular parts of materials in the record" to support her assertion.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000) ("[C]onclusory statements of counsel do not substitute for evidence.").

Ms. Campbell's ADA retaliation claim based on her alleged complaints to supervisors in January 2017 fails as a matter of law because Ms. Campbell did not engaged in statutorily protected activity.  Ms. Campbell alleges that "she complained to supervisors that she was not being permitted to perform available work she was qualified for under her reasonable accommodation, forcing her into a less-valuable and thus precarious position."  (Doc. 1 at 25, ¶ 123).  However, Ms. Campbell admitted that she has no evidence to support this contention.  (Doc. 20-1 at 77).  And, in fact, the evidence demonstrates that after Ms. Campbell returned to work, her supervisors and human resources spoke to her on a weekly basis about her modified work assignments and the possibility of increasing her duties based on her accommodations.  (Doc. 20-1 at 65, 100; Doc. 2-5 at 10−11).  Accordingly,

Ms. Campbell has not demonstrated that she engaged in activity protected by the ADA in January 2017.

Because Ms. Campbell has not established a *prima facie* case of ADA retaliation, the court **WILL ENTER** summary judgment in favor of Defendants on this claim.

### *C.* *ADA Discrimination Claim (Count Five)*

Ms. Campbell alleges that KBR discriminated against her on the basis of her disability by terminating her employment and by failing to provide a reasonable accommodation. Defendants argue that Ms. Campbell's ADA discrimination claim fails because she has not established that she is a qualified individual. (Doc. 19 at 26−28).[3]

To prevail on a discriminatory termination or failure to accommodate claim under the ADA, a plaintiff must demonstrate that she is a "qualified individual" under the statute. 42 U.S.C. § 12112(a) (under the ADA, an employer may not discriminate against a "qualified individual on the basis of disability."); *see Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). The ADA defines a "qualified individual" as an "individual who, with or without reasonable

---

[3] Defendants also argue that Ms. Campbell's proposed accommodations posed an undue hardship. (Doc. 19 at 31−32). As explained below, Ms. Campbell has not shown that she can perform the essential functions of her job with a reasonable accommodation. Therefore, the court does not consider Defendants' alternative argument concerning undue hardship.

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

"The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question." *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017). Concerning essential functions of a position, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

Defendants contend that Ms. Campbell is not a qualified individual because she cannot perform two essential functions of her job—operating mobile equipment and working overtime—with or without reasonable accommodations. (Doc. 19 at 26). In support of its argument, KBR points to the fact that Ms. Campbell's doctor restricted her from working overtime and operating mobile equipment. (Doc. 20-1 at 50–51).

It is undisputed that overtime is an essential function of Ms. Campbell's job. (Doc. 20-1 at 27-28). Ms. Campbell disputes that operating a forklift is an essential function of her job because it was only part of her responsibilities and she felt sure another order filler could perform that function when it was required of

her.  (Doc. 42 at 29–30).  Separate and apart from the fact that a forklift is merely one of several types of mobile equipment that Ms. Campbell was called upon to use "almost every day" (doc. 20-1 at 26–27), the law does not require that a particular task be performed most of the day in order for it to be considered "essential" under the ADA.  29 C.F.R. § 1630.2(n).  And, the fact that KBR included operating mobile equipment in the order filler job description (doc. 20-6 at 2), evidences its judgment that operating mobile equipment is in fact an essential function of the job.

Thus, to show that she is a qualified individual, Ms. Campbell must prove that with or without a reasonable accommodation she could operate mobile equipment and work overtime.  *See Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir. 1997).  KBR attempted to accommodate Ms. Campbell's restrictions by providing her a temporary position consisting of only some of the responsibilities of an order filler.   (Doc. 20-3 at 17, 19–20; Doc. 20-5 at 15; Doc. 20-1 at 64–65). The decision to create the role was based on Ms. Campbell's assurances that her inability to perform all essential functions as an order filler was temporary.  (Doc. 20-1 at 77–78; Doc. 20-5 at 10–11, 15–16).  As time passed, it became increasingly clear that these restrictions were not temporary.  (Doc. 20-1 at 27, 69, 77–78; Doc. 20-5 at 20–22).  In fact, Ms. Campbell's doctor opined on January 20, 2017, that Ms. Campbell "risk[ed]

catastrophic psychiatric deterioration" if she attempted to work overtime for at least two more months. (Doc. 20-11 at 2). In light of Ms. Campbell's prognosis, that accommodation is not reasonable because a "reasonable accommodation" does not require an employer to create a new, permanent position. *See Richardson v. Honda Mfg. of Alabama,* LLC, 635 F. Supp. 2d 1261, 1280 (N.D. Ala. 2009) (internal citations omitted).

Ms. Campbell maintains that KBR could have accommodated her by allowing her to work a "perfect job" that required her to perform only a handful of the functions or portions of the functions involved in the order filler job. (Doc. 42 at 18, 31). This argument is not persuasive because the ADA "may require an employer to restructure a particular job," but the statute does not require employers "to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260.

Because Ms. Campbell cannot demonstrate that she could perform the essential functions of her job with or without a reasonable accommodation, the court **WILL ENTER** summary judgment in favor of Defendants on Ms. Campbell's ADA discrimination claim.

## III. CONCLUSION

For the reasons stated above, the court **WILL GRANT** the Defendants' motion for summary judgment and **WILL ENTER** judgment as a matter of law. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 26, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE